IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

vs.

ADAM BIED,

Defendant.

Criminal No. 24-10171-FDS

**(Leave to File Granted on October 21, 2025, ECF No. 106)**

**REPLY TO OPPOSITION TO DEFENDANT'S MOTION FOR SCHEDULE OF EXPERT DISCLOSURES AND DISCLOSURE OF GOVERNMENT'S EXHIBIT LIST**

Defendant Adam Bied submits this Reply in response to the Government's Opposition to Defendant's Motion for Schedule of Expert Disclosures and Disclosure of Government's Exhibit List ("Opposition"). *See* ECF No. 104. As set forth below, the government's Opposition is based on material misstatements of law and fact.

## I. THE DEFENDANT PROPOSES MODIFICATIONS TO THE GOVERNMENT'S SCHEDULE FOR EXPERT DISCLOSURES

The defendant is amenable to a modification of the expert disclosures schedule proposed in his Motion and in line with the government's proposal as outlined below. However, any schedule must account for: (1) the government's misstatement of the law applicable to and complexity of this case; (2) the fact that all species experts should be disclosed at the same time; and (3) the defendant's experts' need for time to analyze the government's disclosures.

### A. The Government Must Establish that "Wildlife" Are Regulated by CITES and/or ESA, Which Requires Expert Testimony

The Government charges "three counts of wildlife trafficking in violation of the Lacey Act (16 U.S.C. §§ 3772(a) and 3373(d)) and two counts of conspiracy to commit smuggling and Lacey Act trafficking in violation of 18 U.S.C. § 371." ECF No. 1 ("Information").

As the government states in its charging document, a violation of the Lacey Act is proven if the government shows the defendant transported, bought, or sold wildlife in knowing *violation of any law, treaty, or regulation*. *See* 16 U.S.C. § 3373(d)(1)-(2); Information, p. 8, ¶ 30(b). Likewise, to prove a defendant conspired to commit Lacey Act violations, the government must show the defendant conspired to transport, purchase, or sell wildlife in knowing *violation of any law, treaty, or regulation*.[1]

As to the smuggling charge, a violation of the smuggling statute is committed if the defendant "receives, conceals, buys, [or] sells … merchandise after importation, knowing the same to have been imported or brought into the *United States contrary to law*." Information, p. 8, ¶ 30(a); 18 U.S.C. § 545. The operative words being: in *violation of any law, treaty, or regulation; and contrary to law.*

Here, the government alleges that the *violation of law* consists of the importation, purchase, and sale of protected and endangered species regulated by CITES, ESA, and related regulations under the same.[2] ESA and CITES are interrelated: CITES is an international

---

[1] Lacey Act Trafficking offenses require a "two-step" approach:

> "The substantive trafficking provisions of the Lacey Act prohibits importing, exporting , transporting , selling, receiving, acquiring or purchasing illegal wildlife. The offense has a two-step structure. The <u>first step</u> is the underlying violation in which wildlife is taken, possessed, transported, or sold in violation of federal, tribal, state, or foreign law. <u>The second step</u>, which completes the Lacey Act violation, is the subsequent import, export, transport, sale, receipt, acquisition, or purchase of that wildlife… [ ] Generally, the "first step" illegal act must precede and be transactionally distinct from the "second step" act, and the underlying law *must be one specifically related to wildlife*. The requirements for the second step differ depending on whether the underlying law is federal, tribal, foreign, or state."

Barnum, Cassandra J., Cong. Rsch. Serv., R48669, Energy & Natural Resources; Foreign Affairs; Justice & Law Enforcement, (2025), available at https://www.congress.gov/crs-product/R48669.

[2] CITES stands for the Convention on International Trade in Endangered Species of Wild Flora and Fauna, March 3, 1973, 27 U.S.T. 1087; relevant implementing provisions of the ESA may be found at 16 U.S.C. §§ 1537A, 1538(c)(1); and the Department of Interior regulations further implementing CITES may be found at 50 C.F.R. §§ 23.1–23.92.

agreement to protect the importation of certain species due to their unique protected status, and the agreement is implemented in the United States by the ESA and regulations authorized thereby. *See United States v. Place*, 693 F.3d 219, 222 (1st Cir. 2012). However, they serve different primary functions: ESA is a national law focused on listing and protecting species within the U.S. and enforcing CITES, while CITES is an international treaty that regulates trade in species threatened by international commerce. The ESA establishes listing criteria and implements protection for species, whereas CITES organizes species into appendices that dictate the level of restriction on their international trade.[3]

As the government includes in its charging documents, both ESA and CITES regulate certain species or "wildlife," which are treated differently according to their classification, which in turn determines requirements for importation, exportation, and trade. Some of those requirements include permit and license regulations, depending on the classification. Therefore, the specific identification of species determines whether it is prohibited from sale, trade, or import due to its "endangered" or protected listing. 16 U.S.C. § 1532(19).[4]

In its Information, the government alleges Mr. Bied imported, or conspired to import, certain species that required permit and licensing and that other species were squarely prohibited from importation due to their endangered or protected status. *See* Information, pp. 1, 3-9. In the government's Opposition, however, it now contends it has no obligation to establish the identity of a particular species. Specifically, the government states that "the government need only prove

[3] Convention on International Trade in Endangered Species of Wild Fauna and Flora, art. II, app. I (Mar. 3, 1973), available at https://cites.org/eng/app/index.php.

[4] *Strahan v. Holmes*, 595 F. Supp. 2d 161, 164 (D. Mass. 2009). The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man. 16 U.S.C.A. § 1532 (16) The term "species" includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature. 16 U.S.C.A. § 1532

that the specimen constitutes 'wildlife' within the meaning of the Lacey Act and that it was not properly declared when it entered the United States." Opposition, pp. 2, 4.

This is an entirely misleading statement because to be "within the meaning" of the Lacey Act, the species ***by definition*** must be a species of wildlife classified as protected by ESA and/or CITES. In order to violate CITES in the manner the government has alleged, namely, that Mr. Bied imported certain species that fall into the most stringent license and permit categories (Appendix I and II), there of course needs to be a determination that the specific specimen is actually regulated by CITES due to its protected classification. The same applies to "wildlife" that the government categorizes as "endangered" under the ESA.

As the government is aware, assigning the correct species of wildlife is no easy task. Accurate identification requires the collection, identification, and examination of all available evidence and includes methods ranging from visual examination through in-person comparison to 3D scanning and comparisons to known species. See **Exhibit A**, Affidavit of Bri Heisler, ¶¶ 6-8. In the case at hand, the government has produced two separate lab reports that directly relate to their expert's finding that the skulls from Counts Three and Four were Javan leopards.

In reviewing these two reports, the defendant's expert identified various issues with the government's methodology and ultimate findings. There are also certain significant details and observations that are absent from the report or purely incorrect altogether. All of these issues justify an order for early disclosures in advance of a *Daubert* hearing.

**B. All Species and "Wildlife" Experts Should Be Disclosed Simultaneously**

The government suggests that all non-morphology experts should be disclosed on a different timeline from morphology experts, including certain experts on "the native habitats of animal species … to demonstrate that the species are not native [to] the U.S. and therefore

necessarily were transported to the U.S." Opposition, p. 6. The defendant respectfully submits that these experts should be disclosed on the same timeline as morphology experts. As stated above, any expert opining on the native habitats of species—whether two or twenty—will have to demonstrate how it is they know a certain species is what the government alleges it to be. Further, it does not make sense to require disclosure of some animal experts *after* the *Daubert* date, where the defendant must have a full opportunity to challenge the government's experts.

### C. The Defendant's Proposed Schedule

For the reasons stated above, the defendant proposes the following schedule:

| | **Government's Proposed Date** | **Defendant's Proposed Date** |
|---|---|---|
| Government discloses all animal/species experts, including morphology, habitat, or other | December 26, 2025 | December 26, 2025 |
| Defendant discloses all animal/species experts, including morphology, habitat, or other | January 23, 2026 | February 9, 2026[5] |
| *Daubert* challenges simultaneously filed | February 20, 2026 | March 1, 2026 |
| Government's non-animal expert disclosures due | March 13, 2026 | March 13, 2026 |
| Defendant's non-animal expert disclosures due | No proposal | March 27, 2026 |

## II. THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S REQUEST FOR AN EXHIBIT LIST IS BASED ON A SUBSTANTIAL MISREPRESENTATION OF THE VOLUME AND TYPE OF DISCOVERY

The defendant is deeply perplexed by the government's response to his request for an exhibit list 60 days in advance of trial. Rather than addressing any of the defendant's concerns head-on, the government appears to be suggesting that: (1) "the contents of the defendant's

---

[5] The defendant proposes a two-week modification to allow his expert sufficient time, after the Christmas holiday, to conduct analyses of the species at issue in this case, particularly in light of the fact that the government has underestimated how much expert testimony is needed. *See* **Exhibit A**, ¶ 12.

electronic devices and email account" are not "documents," in order to suggest that the volume of documents in this case is small, but without any support; (2) "[t]he bates stamped discovery in this case amounts to less than 2,500 pages of material," while ignoring hundreds of thousands of pages of bates-stamped documents the government produced to the defendant; and (3) the defendant's concerns about the volume of discovered are misplaced because the sources of the documents are his laptop, computer, and email account—again, with no support whatsoever. Opposition, pp. 6-7.

The suggestion that the contents of the defendant's electronic devices and email account are not documents strains understanding. Is the government contending that a text message or email is not a document? Fed. R. Crim. P. 16(a)(1)(E) makes no distinction between "books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items"—**<u>all</u>** of these items are subject to inspection, and advance disclosure in cases like this, "if the item is within the government's possession, custody, or control" and material to the defendant's defense or the government's case-in-chief.

The government also seems to, at best, misremember the discovery it turned over to the defendant. The government represents that the bates-stamped documents it turned over to the defendant totaled fewer than 2,500 pages. Opposition, p. 6. That is patently false. As the email chain attached as **<u>Exhibit B</u>** shows, **<u>one</u>** of the government's productions was 2,317 pages. However, the **<u>next</u>** production, of the Defendant's Gmail account, was bates-stamped from USAO_002317 to USAO_137945 and contained 135,628 pages of bates-stamped Gmail data, which primarily consist of discrete emails, many of which have separate attachments. Are these not documents, or do they somehow not count as discovery because the government alleges they

were not bates-stamped, even though they were?[6] The defendant has similar concerns regarding the additional tens of thousands of bates-stamped messages retrieved from his cell phone.[7] Between these sources—and unless the government is aware of a definition of documents that excludes emails and cell phone messages—there are, in fact, 216,000 documents in this case.

Nor is the government relieved of its obligation to disclose exhibits because they were found in the defendant's own devices. Rule 16 makes no distinction between documents retrieved from the defendant or a different source—it only distinguishes between documents and items that are relevant to the defense or the government's case-in-chief and those that are not. This is especially true where the government has not produced a table of contents or index of the hundreds of thousands of pages of discovery at issue here, in contravention of Local Rule 116.10. The defendant may have some familiarity with his own records, but where hundreds of thousands of documents are potentially responsive to the government's two broad conspiracy counts, it is clearly essential that he is not left in the dark in preparing his defense.[8]

Notwithstanding these perplexing contentions, the defendant yet again welcomes the opportunity to clarify the government's position, which the defendant has sought to do time and

---

[6] Just by way of example to show that these documents contain potentially relevant information, attached **Exhibit C** and **Exhibit D**, bates-stamped USAO_044655 and USAO_11480, respectively, demonstrate the defendant's interest in shark teeth.

[7] The government also appears to forget what occurred with the defendant's cell phone data. As the email chain attached as **Exhibit E** shows, there was a substantial back and forth between the parties because of difficulties ingesting the cell data in the format the government provided. Ultimately, in May and June of 2025, the defendant had to physically retrieve the cell data on a hard drive from the government. The defendant then ingested the data, which, because it was produced in native format, did not have any bates stamps. Therefore, on June 9, 2025, a member of the defendant's legal team asked the government "I can go ahead and run the data as a production to apply bates numbers if that is okay with you." The government then replied in the affirmative, and the defendant then applied bates stamps. Although the government's reply in **Exhibit E** suggests that "[t]he next bates number [wa]s USAO_002317," the email chain in **Exhibit B** shows that, in fact, the cell data begins at USAO_137946.

[8] "Any party producing more than 1,000 pages of discovery in a criminal case shall provide a table of contents that describes, in general terms, the type and origin of the documents (for example, 'bank records from Sovereign Bank for John Smith;' 'grand jury testimony of Officer Jones') and the location of the documents so described within the larger set (for example, by Bates number)."

again without motion practice. Is the government now contending that documents beyond bates stamp USAO_002317 are not relevant to this case? If so, the government is right that the defendant may not need 60 days to review its exhibit list. As the defendant set forth in his original Motion, there are cases in which voluminous discovery need not require early disclosure of an exhibit list where the government adopts "the negative identification approach" and disclaims reliance on tens or hundreds of thousands of documents, so that the defendant actually has the ability to inspect the government's discovery and prepare his case. *United States v. Farah*, No. 22-CR-124 (NEB/TNL), 2023 WL 8757097, at *6 (D. Minn. Dec. 19, 2023), quoting *United States v. Contech Engineered Sols. LLC*, No. 5:20-CR-481-FL-2, 2021 WL 714991, at *4-5 (E.D. N.C. Feb. 18, 2021). If the government intends to proceed this way, as its Opposition indicates, the defendant may be open to a modification of the 60-day schedule he proposed.

## III. CONCLUSION

WHEREFORE, defendant Adam Bied respectfully requests that this Court enter an order:

(i) Setting the schedule proposed by the defendant for disclosure of expert testimony; and

(ii) Requiring the government to disclose its exhibit list no later than February 12, 2026.

Respectfully submitted,

By his attorneys,

Max D. Stern, Esq. (BBO No. 479560)
Shayla Mombeleur, Esq. (BBO No. 698707)
Samuel M. Myers, Esq. (BBO 711471)
Todd & Weld LLP

One Federal Street
Boston, MA 02110
(617) 720-2626
mdstern@toddweld.com
smombeleur@toddweld.com
smyers@toddweld.com

Dated: October 21, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 21, 2025.

Max D. Stern